**Opinion filed August 13, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-07-00318-CV

_____

### RENTECH STEEL, L.L.C., Appellant

### V.

### PRESTON TEEL, LESA CROSSWHITE, AND JENNINGS TEEL, Appellees

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 7813-D**

## O P I N I O N

Preston Teel and his parents, Lesa Crosswhite and Jennings Teel, sued Rentech Steel, L.L.C.[1] after Preston sustained serious bilateral hand injuries while cleaning a power roller machine that draws in steel plates and rolls them into a cylindrical shape. Preston was sixteen years old at the time of the accident and had recently begun a summer job at Rentech, a steel fabrication plant. The plaintiffs alleged negligence and gross negligence. At trial, Rentech admitted making mistakes and

---

[1]Although the plaintiffs also sued other entities, these entities settled with the plaintiffs and were dropped as defendants from the petition that served as the live pleading at the time of trial.

accepted responsibility for the accident. The jury found that Rentech was negligent, but not grossly negligent, and awarded actual damages of $11,850,000 to Preston and $620,000 to Preston's parents. After reducing Preston's award by the $1,900,000 settlement credit and adding prejudgment interest to the awards, the trial court rendered judgment on the jury's verdict against Rentech for a total of $11,339,221. Rentech appeals, challenging the jury's findings regarding damages and Rentech's sole responsibility for the accident. We affirm in part and modify in part, conditioned on remittitur.

*Issues on Appeal*

In Issue I, Rentech challenges the jury's failure to find that Bertsch/Mega and Rentz Family Partnership Ltd. were liable for either negligence or products liability. In Issue II, Rentech challenges the legal and factual sufficiency of the evidence in support of the awards for past and future medical expenses and also argues that the trial court erred in disregarding Rentech's legal entitlement to a credit for its payment of past medical expenses. In Issue III, Rentech asserts that the damages awarded by the jury were excessive under the existing standards. Under this issue, Rentech also urges this court to adopt and apply a new, more objective standard to determine whether damages are excessive.

*Standards of Review*

To address Rentech's legal and factual sufficiency challenges, we will apply the following standards of review. When a challenge is made to the legal sufficiency, we must determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must review the evidence in the light most favorable to the challenged finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821-22, 827. We may sustain a no-evidence or legal sufficiency challenge only when (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960)). When a party attacks the legal sufficiency of an adverse finding on an issue on which that party had the burden of proof, the party

2

must demonstrate on appeal that the evidence conclusively establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

To analyze a factual sufficiency challenge, we must consider and weigh all of the evidence and determine whether the evidence in support of a finding is so weak as to be clearly wrong and unjust or whether the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.* at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951).

In applying these standards, we are mindful that the jury is the sole judge of the witnesses' credibility and the weight to give to their testimony. *City of Keller*, 168 S.W.3d at 819. Jurors may choose to believe one witness and disbelieve another and may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. *Id.* at 819-20. Furthermore, even uncontroverted expert testimony does not bind the jury unless the subject matter is one for experts alone – one for which jurors "cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry." *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex. 1998) (quoting *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)); *see also City of Keller*, 168 S.W.3d at 820.

*Liability of Others*

Relying on the uncontroverted testimony of an expert witness, Rentech argues in Issue I that the negligence of Bertsch/Mega and Rentz Family Partnership and the marketing and design defects of the power roller machine were conclusively established and, alternatively, that the jury's negative answers were contrary to the overwhelming weight of the evidence. Rentech contends that settling defendants Bertsch/Mega and Rentz Family Partnership were also responsible for Preston's injuries. Bertsch/Mega manufactured the machine, and Rentz Family Partnership owned the machine but had leased it to Rentech. The jury was asked whether the negligence, if any, of Bertsch/Mega, Rentz Family Partnership, or Rentech proximately caused the occurrence in question. The jury answered affirmatively as to Rentech only. The jury was also asked whether there was a marketing defect or a design defect in the power roller machine when it left Bertsch/Mega or Rentz Family Partnership that was a producing cause of the occurrence in question. The jury answered each question, "No."

3

These answers indicate that the jury failed to find that Rentech carried its burden of proof by a preponderance of the evidence. *See C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966).

In this case, the only evidence regarding the conduct of Bertsch/Mega and Rentz Family Partnership came from William W.R. Purcell, an expert retained by the plaintiffs but called as a witness at trial by Rentech. Purcell had degrees in civil engineering and safety engineering and over forty years of experience in these fields, and he was a certified safety professional. Purcell conducted an investigation and determined that Bertsch/Mega and Rentz Family Partnership did not comply with applicable safety standards because they failed to place adequate warnings in the danger zone on the sides of the machine and failed to provide adequate instructions and warnings for cleaning the machine. Purcell concluded that the machine was unreasonably dangerous because of marketing defects and inadequacies in the manuals and warnings. Purcell also implicated Rentech for various failures and violations of safety standards. Although Purcell did not testify about causation, he indicated in a single finding in a report that was admitted into evidence that the "unreasonably dangerous conditions and design defects, failures, and associated negligent acts of commission or omission, on the part of Bertsch and Rentech . . . were more than likely producing and proximate causes of the incident and related injuries." This conclusion was also made applicable to Mega and Rentz Family Partnership in a subsequent report.

In this case, causation was not a matter for experts alone and did not require a technical or scientific explanation; it was within the jury's ability to determine on its own what caused the accident and resulting injuries. *See K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 361 (Tex. 2000) (holding that it was within the jury's ability to determine on its own whether lack of a railing caused the accident). Because causation was not an issue for experts alone, the jury could have disregarded Purcell's conclusion as to causation. The jury was free to conclude based upon the evidence presented at trial that Rentech failed to prove by a preponderance of the evidence (1) that the negligence of Bertsch/Mega or Rentz Family Partnership was a cause of the accident and (2) that a marketing or design defect was a cause of the accident. Other evidence before the jury included pictures of the actual roller machine and the warnings already located on the machine; testimony from a Rentech employee who operated the machine that a manual containing Bertsch's operating

instructions had previously been supplied to Rentech; and testimony indicating that the Rentech employee operating the machine was knowingly violating the safety warnings and company policy at the time of the incident. Furthermore, evidence proving a safer alternative design was lacking. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999) (a safer alternative design must be proven in order to recover under a design defect theory).

We hold that the evidence is both legally and factually sufficient to support the verdict with respect to Bertsch/Mega and Rentz Family Partnership. Rentech did not conclusively establish a causal nexus between the accident and Bertsch/Mega and Rentz Family Partnership. Further, the jury's findings regarding Bertsch/Mega and Rentz Family Partnership were not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Issue I is overruled.

*Medical Expenses*

In Issue II, Rentech challenges the legal and factual sufficiency of the evidence in support of the awards for past and future medical expenses and also argues that the trial court erred in disregarding Rentech's legal entitlement to a credit for its payment of past medical expenses. Based upon the jury's findings, the trial court awarded past medical expenses of $550,000 to Preston's parents and future medical expenses of $1,000,000 to Preston.

With respect to past medical expenses, Preston and his parents agree that the amount awarded exceeds the amount proved at trial. All parties agree that the amount of past medical expenses actually proved at trial was $381,788. Preston and his parents state in their brief that they will accept a reduction to that amount. They assert that a remittitur of $168,212 is the proper remedy. Rentech contends, however, that a remittitur is not the proper remedy because there is no evidence to support the award of $550,000 and that we must reverse the judgment and remand the cause for a new trial.

The Texas Supreme Court has employed both of these remedies in various cases where there was evidence to support some damages but no evidence to support the amount awarded by the jury. *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007). The court in *Guevara* noted that a remittitur was determined to be the appropriate remedy in *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006), whereas a remand for a new trial was ordered in *Minnesota Mining & Manufacturing Co. v. Nishika Ltd.*, 953 S.W.2d 733 (Tex. 1997). In *Guevara*, the evidence was

legally insufficient to show that the car accident caused all of the medical expenses awarded by the jury, and the supreme court determined that the proper remedy was to remand to the court of appeals to consider a remittitur as to expenses for which expert evidence was required. 247 S.W.3d at 670. The *Guevara* court also stated that, if an appropriate remittitur cannot be determined, then the court of appeals should remand the case to the trial court for a new trial. *Id.*

Relying on *Guevara*, we believe the circumstances in this case to be appropriate for remittitur. An appropriate remittitur is determinable in this case. After reviewing the record and considering the briefs, we agree with the parties that the amount of past medical expenses supported by the evidence admitted at trial is only $381,788, not $550,000 as found by the jury. Therefore, we suggest a remittitur in the amount of $168,212. TEX. R. APP. P. 46.3.

Rentech also asserts that it was entitled to a credit for its payment of past medical expenses. The plaintiffs assert that Rentech was not entitled to any such credit because the payments were made by an insurance company and were subject to the collateral source rule.

The theory behind the collateral source rule is that a wrongdoer should not have the benefit of insurance independently procured by the injured party and to which the wrongdoer was not privy. *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 934 (Tex. 1980). However, when the wrongdoer "has provided for those damages, either by personal payment or insurance payment, the damage claim has been satisfied"; to permit the injured party in such circumstances to keep the insurance money and also collect from the wrongdoer "would be a double recovery not sanctioned by law." *Id.* at 935 (citing *Publix Theatres Corp. v. Powell*, 71 S.W.2d 237 (Tex. 1934)). Payments made pursuant to an employee benefit plan have been determined to be a collateral source if the benefit plan constitutes a fringe benefit for the employee, but if the primary purpose of the benefit plan is to protect the employer, then the plan is not a collateral source as against the employer. *Johnson v. Dallas County*, 195 S.W.3d 853, 855 (Tex. App.—Dallas 2006, no pet.); *Taylor v. Am. Fabritech, Inc.*, 132 S.W.3d 613, 626 (Tex. App.—Houston [14th Dist.] 2004, pet. denied); *Castillo v. Am. Garment Finishers Corp.*, 965 S.W.2d 646, 650 (Tex. App.—El Paso 1998, no pet.); *Tarrant County Waste Disposal, Inc. v. Doss*, 737 S.W.2d 607, 611 (Tex. App.—Fort Worth 1987, writ denied) (holding that payments made by an employer's insurance carrier under its accident policy

covering on-the-job injuries do not constitute a collateral source and that the nonsubscriber employer was entitled to an offset).

The right of offset is an affirmative defense. The burden of pleading offset and of proving the facts necessary to support it are on the party asserting the right to an offset. *Brown*, 601 S.W.2d at 936. The record in this case shows that Rentech asserted its right of offset both in its pleadings and during trial. Outside the presence of the jury, Rentech offered proof from Rentech employee Robin Walker, who was the plan administrator for Rentech's occupational injury benefit plan. Walker testified that Rentech was not a workers' compensation subscriber but that Rentech had purchased an occupational injury benefit plan to pay expenses related to employees' on-the-job injuries and also to protect Rentech from liability from lawsuits arising out of any such injuries. Rentech's occupational injury benefit plan provided that it was adopted to provide prompt payment of a participant's covered expenses and "to limit the Company's liability when a Participant is injured." Furthermore, the plan defined benefits as "the payment for necessary medical care required as a result of an accidental work related on-the-job injury or illness, as described in this Plan; and salary continuance Benefits for periods of disability resulting from an accidental work related on-the-job injury or illness, as described in this Plan, as well as death, dismemberment, and paralysis Benefits." The terms of the plan itself establish that it was an accident policy covering on-the-job injuries and that its purpose was to protect Rentech.

We hold that Rentech was entitled to an offset. The uncontroverted evidence shows that Rentech's occupational injury benefit plan was purchased for the primary purpose of protecting Rentech, not for providing a fringe benefit, and was therefore not a collateral source. The trial court erred in denying Rentech's request for an offset.[2]

The question then becomes the appropriate amount of offset. Outside the presence of the jury, Walker testified that all of the medical bills that had been submitted for payment, totaling $551,184.34, had been paid – though some had been satisfied by paying reduced rates. The records from the company that actually paid the benefits on behalf of Rentech's insurance company were

_____

[2]We note that the plaintiffs assert that offset was not proper because the insurance company had intervened and asserted a claim for subrogation with respect to the settlement proceeds received from the settling defendants. However, the plea in intervention and all claims between the plaintiffs and the insurance company were severed from this cause. Any issue relating to a possible subrogation is not before this court and does not affect Rentech's right of offset.

also submitted in Rentech's offer of proof. These records indicated that medical bills totaling $487,682.68 were received and that all of them had been satisfied, though paid at a reduced rate. Regardless of which amount is accurate, either amount is greater than the amount of past medical expenses proven by the plaintiffs: only $381,788.[3] Therefore, upon the remittitur suggested above, Rentech will be entitled to an offset for the entire amount of the award for past medical expenses, and the judgment shall be modified accordingly – reducing the award to Preston's parents to $70,000. *See Doss*, 737 S.W.2d at 611-12 (reforming trial court's judgment to reflect offset).

Rentech next argues that the evidence is legally and factually insufficient to support the amount of damages awarded to Preston for future medical expenses. The jury found that Preston would incur $1,000,000 in future medical expenses. Preston's doctor determined that Preston would undergo ten to fifteen more surgeries in the future at a cost of $5,000 to $20,000 per surgery. A life care planner calculated Preston's future medical and related expenses to be $2,925,299.89, which included $1,982,110 for home maintenance, a bookkeeper, a housekeeper, and a home health aide. During cross-examination of the plaintiffs' life care planner and during the direct examination of another life care planner who testified for the defense, the calculations and the necessity of the expenses listed in the plaintiffs' life care plan were challenged. The admissibility of the evidence regarding the plaintiffs' life care plan is not at issue on appeal.

The award of future medical expenses lies within the discretion of the factfinder. *Ibrahim v. Young*, 253 S.W.3d 790, 808 (Tex. App.—Eastland 2008, pet. denied); *City of San Antonio v. Vela*, 762 S.W.2d 314, 321 (Tex. App.—San Antonio 1988, writ denied). To sustain an award of future medical expenses, the claimant must present evidence to show that there is a reasonable probability that medical expenses will be incurred in the future and the reasonable costs of such care. *Ibrahim*, 253 S.W.3d at 808; *Columbia Med. Ctr. of Las Colinas v. Bush*, 122 S.W.3d 835, 862-63 (Tex. App.—Fort Worth 2003, pet. denied). Because no precise evidence is required, the factfinder may award damages for future medical expenses based upon the nature of the injury, the medical care rendered prior to trial, and the condition of the injured party at the time of trial. *Ibrahim*, 253 S.W.3d at 809. Based upon the nature of Preston's injuries, his condition at trial, the life care plan,

---

[3]We note that both amounts are not greater than the $550,000 actually awarded by the jury. Accordingly, if the plaintiffs do not file an appropriate remittitur, the amount of offset to which Rentech is entitled must be determined on remand.

and the probability of an additional ten to fifteen future surgeries, we hold that it was within the jury's discretion to find future medical expenses of $1,000,000. The evidence is both legally and factually sufficient to support that finding.

Accordingly, Issue II is sustained in part and overruled in part. It is sustained with respect to the challenges to the award of past medical expenses and overruled as to the challenges to the award of future medical expenses.

*Excessiveness of Damages*

In Issue III, Rentech contends that the damages – whether considered individually or as a whole – are excessive and require either a substantial remittitur or a new trial. Rentech's argument is based upon the sufficiency of the evidence in this case, upon a comparison of damage awards from similar cases, and alternatively, upon a revised remittitur standard that Rentech encourages this court to adopt.[4]

To determine whether the damages awarded to Preston are excessive, we must consider the factual sufficiency of the evidence. In reviewing a challenge that an award for a category is excessive, we must consider all the evidence that bears on that category of damages, even if the evidence also relates to another category of damages. If more than one award in overlapping categories is challenged as excessive, we must consider all the evidence that relates to the total amount awarded in all overlapping categories to determine if the total amount awarded is excessive. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 773-74 (Tex. 2003). We note that non-economic damages cannot be determined with mathematical precision but only by the exercise of sound judgment. *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002). Accordingly, a jury is given some latitude in awarding such damages, but its discretion is limited; the evidence must justify the amount awarded. *Id.*; *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). A jury may not simply pick a number and put it in the blank, but must find an amount that "would fairly and reasonably compensate" for the loss. *Saenz*, 925 S.W.2d at 614.

---

[4]Rentech asserts that the amount of damages awarded by the jury exceeded the amount sought by the plaintiffs in their live petition. However, the record shows that the trial court granted the plaintiffs' motion to amend their petition to conform to the jury's award and that the petition was so amended.

In this case, the court requested the jury to determine what sum of money would fairly and reasonably compensate Preston for his injuries and properly instructed the jury not to compensate Preston twice for the same loss. The jury made the following findings with respect to Preston's damages: past disfigurement of $1,500,000; future disfigurement of $50,000; past physical pain and suffering of $2,500,000; future physical pain and suffering of $1,000,000; past mental anguish of $1,750,000; future mental anguish of $300,000; past medical expenses of $1,000,000; past physical impairment of $2,000,000; future physical impairment of $1,000,000; and loss of earning capacity of $750,000. The jury also found that Preston's parents were entitled to $70,000 for past nursing care and $550,000 for past medical expenses.

The term "disfigurement" includes an impairment or injury to the beauty, symmetry, or appearance of a person or thing, rendering it unsightly, misshapen, imperfect, or deformed in some manner. *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960); *Pendergraft v. Carrillo*, 273 S.W.3d 362, 367 (Tex. App.—Eastland 2008, pet. denied). The jury was able to determine the amount of damages for past and future disfigurement from viewing pictures of Preston's hands, viewing Preston's hands at trial, and hearing testimony from Preston's surgeon about what the future holds with respect to that issue. There was also evidence of scarring from skin grafts and tissue removal on Preston's sides and hip area, both thighs from the top of his knee to his hip, and upper arm.

Evidence of Preston's past and future physical pain and suffering was abundant. Preston's experienced orthopedic hand surgeon described Preston's injury as "the worst bilateral hand injury that I have seen or taken care of"; Preston "essentially had both of his hands ripped off." At the time of the injury and at the hospital, Preston screamed in agony. Not only did Preston testify about the pain he experienced, but the severity of the pain was evident from his screams; the amount of blood; the crushing of Preston's bones (which he could hear and feel crunching and popping, tendons, nerves, and arteries; the complete degloving of his hands, i.e., the separation of the skin and tissue from the underlying bones; a thumb and pieces of some fingers being "ripped off"; the subsequent rotting of parts of both hands; and the eventual amputation of several fingers. According to Preston's orthopedic hand surgeon, Dr. Karen Johnston-Jones, Preston was "shaking with pain" when he arrived at the hospital in San Antonio and "was in shock from pain," not from the blood loss. Dr. Johnston-Jones characterized the pain as "excruciating," a "12" on a scale of "1 to 10."

10

Pictures of Preston's mangled, bloody hands were admitted into evidence. Preston was given strong pain killers, but still he experienced pain. Preston later had to endure the pain of withdrawal from the strong narcotic pain killers that doctors had given him. Both of Preston's hands had been sewn into "groin flaps" for three weeks. Preston had undergone nineteen surgeries to attempt to save as much of his hands as possible.

The evidence also showed that, at the time of trial, Preston continued to experience pain on a daily basis. Preston had an open wound at the time of trial that would not heal properly. Dr. Johnston-Jones testified that Preston will probably never be pain-free, that the crushed nerves will continue to cause him pain, that he had already developed severe arthritis in his hands, and that he would probably need ten to fifteen additional surgeries in the future.

To recover damages for mental anguish, a plaintiff must introduce "direct evidence of the nature, duration, and severity" of his mental anguish – establishing "a substantial disruption" in his daily routine – or "evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (quoting *J.B. Custom Design & Bldg. v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ)). The record shows that Preston, his mother, his father, his orthopedic surgeon, and professional counselor testified about Preston's withdrawal from others, the loss of his friends, his depression, his anguish in coping with the injuries to his hands, his struggle to overcome an addiction to the prescribed painkillers, and his thoughts of suicide. Preston's surgeon testified that his depression was "very clear" by one month after the accident.

Damages for "physical impairment" encompass the loss of enjoyment of life, the effect of which must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity. *Golden Eagle Archery*, 116 S.W.3d at 772. The evidence indicates that Preston's injuries have caused physical impairment. Preston is unable to do many everyday tasks like open a water bottle or button his shirt. His ability to write is very limited because of the pain writing causes. He can use a computer by pecking with a middle finger and a thumb. Although Preston showed incredible determination and character by working hard to make the varsity football team his senior year in high school, he still could not be a receiver or play baseball. He cannot throw or catch a baseball. His ability to do many things he once enjoyed is limited.

11

Testimony regarding the damages for Preston's loss of earning capacity and his medical expenses was provided by expert witnesses. With the exception of the past medical expenses addressed in detail in Issue II, the amount of damages for medical expenses and lost earning capacity was supported by the experts' testimony. Furthermore, the modest amount awarded for nursing care was supported by the testimony of Preston's mother about the extensive amount of care she gave Preston.

After reviewing the evidence in this case, we hold that the evidence is sufficient to support the jury's findings, whether considered individually or as a whole ($12,470,000 before any credit or offset). Thus, the damages are not excessive, and we cannot disturb the jury's findings based upon the record before us.

Rentech also requests that we compare the damages awarded in this case to verdicts in other cases and that we revise the remittitur standard to be more objective. However, the facts in this case are unique. Rentech does not cite any case with facts involving degloving hand injuries to both hands. We have applied the standard of review set out by the Texas Supreme Court. As an intermediate court, we are bound by supreme court precedent. Therefore, we must leave any revision of the standard to the supreme court or the legislature. Issue III is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed in part and, conditioned on remittitur, modified in part. With respect to past medical expenses, we suggest a remittitur in the amount of $168,212. Upon the suggested remittitur, Rentech will be entitled to an offset for the entire amount of the award for past medical expenses, and the judgment shall be modified to delete any award for past medical expenses, thereby reducing the award to Preston's parents to $70,000. If the remittitur is not filed within twenty days from the date of this opinion, the trial court's judgment will be reversed, and the cause will be remanded to the trial court for a new trial. Rule 46.3; *Guevara*, 247 S.W.3d at 670.

JIM R. WRIGHT
CHIEF JUSTICE

August 13, 2009

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

12